IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PRESTON SANCHEZ,

      Plaintiff,

vs.                                             No. 11 CV 657 MV/RHS

BENJAMIN MELENDREZ,
COLE KNIGHT, WILLIAM YOUNG,
LOUIS ARMIJO, JANE DOE, POLICE CHIEF
RAY SCHULTZ and the CITY OF ALBUQUERQUE,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on *Defendants' Motion for Summary Judgment and Memorandum in Support, Requesting Dismissal of Plaintiff's Entire Complaint* (Doc. 18). The Court has considered the motion, briefs, and the relevant law, and being otherwise fully informed, **FINDS** that the motion shall be **GRANTED IN PART** and **DENIED AS MOOT IN PART** for the reasons stated herein.

## BACKGROUND

Plaintiff Preston Sanchez has brought the instant lawsuit against the team of Albuquerque Police ("APD") Officers who arrested him on July 23, 2010, as well as Police Chief Ray Schultz, the City of Albuquerque, and an unknown employee of the Second Judicial District Attorney's Office. In his complaint (Doc. 1), Plaintiff alleged four claims: (1) a Fourth Amendment violation; (2) municipal liability; (3) state tort claims of false arrest and false imprisonment; and (4) a claim for equitable relief in the form of expungement of his arrest record. Defendants now move for summary judgment under a theory that the doctrine of qualified immunity shields them

from liability as to Plaintiff's Fourth Amendment claim.  Defendants further move for dismissal

of Plaintiff's municipal liability claim, arguing that Plaintiff has disclosed no evidence that

would support this claim.[1]  Defendants additionally move for summary judgment with respect to

Plaintiff's state law claims on grounds that they are immune from such claims under the New

Mexico Tort Claims Act.  They move for dismissal of Plaintiff's claim for equitable relief on

grounds that he fails to state a claim upon which relief can be granted.  Finally, Defendant

Albuquerque Police Chief Ray Schultz moves for dismissal of all claims against him, arguing

that Plaintiff has brought no cognizable claim against him.

In the spring and summer of 2010, Defendant Sergeant Armijo was the sergeant in charge

of the "John Squad" or the "Power Squad," an Albuquerque police squad that addressed specific

criminal issues in its area command.  In response to reports of larcenies in downtown

Albuquerque, Sergeant Armijo sought ideas from members of a former police unit that

conducted undercover tactical operation plans, or "tact plans," in the Valley Area Command.

Members of this unit suggested that the squad use different items as bait for potential thieves,

including bicycles, beer, and laptop computers.

First, Sergeant Armijo and his squad conducted a tact plan using a bicycle.  They placed

the bicycle in the back of a pickup truck and parked the truck in various locations in downtown

Albuquerque.  They observed a number of people look at the bike and touch it, but no one ever

took it.  When no one attempted to steal the bicycle, the squad moved on to a laptop computer.

They placed it in various places in the downtown area, "open, or just left," Doc. 21-4 at 2, yet no

one ever attempted to take it.  The squad then placed cigarettes and alcohol in parked cars with

---

[1] Although Defendants style their motion with respect to this claim as a motion to dismiss, their argument takes the
form of a summary judgment motion.  Accordingly, the Court will analyze this claim under the summary judgment
standards.

the windows down on a number of occasions, but again failed to observe anyone attempt to remove these items from the vehicles.

After these tact plans were unsuccessful, Sergeant Armijo contacted Jill Martinez, an assistant district attorney in the Community Crimes division with whom he had communicated about the contours of the tact plan involving laptop computers.  Sergeant Armijo asked Ms. Martinez if she thought placing a laptop in a backpack and leaving it in a public area would be an appropriate tact plan.  Ms. Martinez responded that she did not see a problem with such a plan. Sergeant Armijo proceeded to speak to his lieutenant, Kevin Rowe, and his captain, Ray Mason, about the idea.  Neither officer saw any problem with the plan, so Sergeant Armijo took steps to implement it.  After the plan was implemented, Ms. Martinez left the District Attorney's office, and Sergeant Armijo began meeting regularly with an assistant district attorney named Chris Schultz, who provided him direction in conducting the operation.

On July 23, 2010, at Sergeant Armijo's direction, Defendant Officers Melendrez, Knight and Young ran the operation which ultimately resulted in Plaintiff's arrest.  Sergeant Armijo was not present during the operation.  Officer Melendrez, dressed in plain clothes, placed a backpack containing a broken laptop, beer and cigarettes next to an ATM which was located directly across the street from a high school.  Sergeant Armijo and Officer Young both stated with some equivocation that the backpack had a label on it with contact information for the owner.  Officer Melendrez pretended to use the ATM and he then walked away, "forgetting" his backpack. After between ten and twenty minutes, Plaintiff approached the ATM.  He stood in line behind another customer, and he noticed the backpack.  Defendants observed him speaking to the other customer.  The other customer left, and Plaintiff began to examine the backpack.  He saw the beer, cigarettes, and computer, and he placed the backpack in his truck, which he had left with

3

the engine running, positioned ten to fifteen feet away from the ATM.  He then returned to the

ATM and completed his transaction.  He returned to his vehicle and prepared to drive away, at

which point Defendants arrested him.

Officer Melendrez made the decision to arrest Plaintiff, with Officers Young and Knight

as part of the arrest team.  Officer Melendrez placed Plaintiff in handcuffs and read him his

*Miranda* rights.  Officer Melendrez then contacted the on-call assistant district attorney to

request his opinion as to whether or not he should proceed with the arrest.  In Officer

Melendrez's words, "I was calling to see what their opinion was . . . of what kind of case we are

going to have if we were to prosecute this case." Doc. 21-1 at 4.  The assistant district attorney,

whose name Officer Melendrez does not remember, told him that "it seemed to be a good arrest."

*Id*.  Officer Melendrez proceeded to arrest Plaintiff and charge him with felony larceny.  Plaintiff

spent one night in jail.

## APPLICABLE LAW

I.      **Dismissal Under Rule 12(b)(6)**

Pursuant to the Federal Rules of Civil Procedure, a court may dismiss a complaint for

"failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  A motion to

dismiss under Rule 12(b)(6) "tests the sufficiency of the allegations within the four corners of the

complaint after taking those allegations as true."  *Mobley v. McCormick*, 40 F.3d 337, 340 (10th

Cir. 1994).  This Court must accept as true all well-pleaded factual allegations in the complaint,

view those allegations in the light most favorable to the non-moving party, and draw all

reasonable inferences in the plaintiff's favor.  *Moore v. Guthrie*, 438 F.3d 1036, 1039 (10th Cir.

2006).

To pass muster under Rule 12(b)(6), a complaint need not recite detailed factual allegations, but a plaintiff must set forth the grounds of his or her entitlement to relief beyond "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555 (citation omitted). A plaintiff's "allegations must be enough that, if assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for relief." *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). Pursuant to *Twombly*, a plaintiff must "nudge his claims across the line from conceivable to plausible" in order to survive a motion to dismiss. 550 U.S. at 570. Thus, "the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis removed).

## II.     Summary Judgment

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party bears the initial burden of showing "an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation and marks omitted). The burden then shifts to the non-moving party to show a genuine issue of material fact. *Id*. In response to a properly supported motion for summary judgment, the non-movant "may not rely merely on allegations or denials in its own pleading . . . [but rather must] set out specific facts showing a genuine issue for trial." *Id*.

5

In reviewing a motion for summary judgment, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings. *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F. 3d 1045, 1050 (10th Cir. 2008). Rather, the Court's task is to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243 (1986). Where a rational trier of fact, considering the record as a whole, could not find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

I.   **Fourth Amendment Claim**

A.   **Qualified Immunity**

The qualified immunity doctrine shields government officials from suits for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Last term, the United States Supreme Court explained:

> Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law. Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.

*Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244-45 (2012) (citations omitted).

In contrast to a traditional summary judgment motion, in the context of qualified immunity the plaintiff bears the burden of proof. *Camuglia v. City of Albuquerque*, 448 F. 3d 1214, 1218 (10th Cir. 2006). To survive a motion for summary judgment where qualified immunity is at issue, Plaintiff must demonstrate on the facts alleged that: (1) Defendants'

6

conduct violated his federal constitutional or statutory rights, and (2) the right violated was clearly established at the time of the alleged violation. *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009) (citing *Pearson*, 555 U.S. 223 (2009)).

In determining whether the plaintiff has met his burden, the Court construes the facts in the light most favorable to the plaintiff as the non-moving party. *Scott v. Harris,* 550 U.S. 372, 377 (2007). In assessing whether the plaintiff's asserted right was clearly established, the Court looks for "Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains." *Koch v. City of Del City*, 660 F.2d 1228, 1246 (10th Cir. 2011). However, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001), *overruled in part by Pearson*, 555 U.S. 223 (2009); *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").

**B.    Analysis**

A warrantless arrest passes muster under the Fourth Amendment only if it is supported by probable cause. *Morris v. Noe*, 672 F.3d 1185, 1192 (10th Cir. 2012). "Probable cause exists where the facts and circumstances within the arresting officer's knowledge and of which they had reasonably trustworthy information are sufficient in themselves to warrant a person of reasonable caution to have the belief that an offense has been or is being committed by the person to be arrested." *Koch*, 660 F.3d at 1239. "Probable cause is measured against an

objective standard of reasonableness and may rest on the collective knowledge of all officers involved in an investigation rather than solely on the knowledge of the officer who made the arrest." *United States v. Zamudio-Carrillo*, 499 F.3d 1206, 1209 (10th Cir. 2007).  "While an effort to fix some general, numerically precise degree of certainty corresponding to probable cause may not be helpful, it is clear that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Illinois v. Gates*, 462 U.S. 213, 235 (1983).

Plaintiff asserts that Defendants are not entitled to summary judgment on their Fourth Amendment claim.  He first argues that the arresting officers violated his constitutional rights when they arrested him without probable cause, and next concludes that "[i]t is clearly established in the Tenth Circuit, and indeed throughout the country, a warrantless arrest must be based on probable cause."  Doc. 21 at 18.  Defendants respond that the arresting officers indeed had probable cause to arrest Plaintiff, and even if they did not, the law in this area was not clearly established at the time of Plaintiff's arrest.  Defendants criticize Plaintiff for

> do[ing] exactly what is prohibited by *Saucier v. Katz*, 533 U.S. 194, 201 (2001): he argues that "the need for probable cause prior to making an arrest is clearly established." Instead of taking the alleged violation as a broad general proposition as Plaintiff is attempting to do, the specific facts of the case must be analyzed to determine whether a right was clearly established at the time of the incident. *Id*.

Doc. 23 at 9.

### 1.    Constitutional Violation

In commencing the probable cause analysis, the Court "examin[es] the elements of the offense for which [Plaintiff] was arrested and [] the evidence in the record of which [Defendants were] aware regarding [Plaintiff's] conduct."  *Jefferson v. Witt*, 17 F. App'x. 887, 891 (10th Cir. 2001) (emphasis removed).  Under New Mexico law, "[l]arceny consists of the stealing of anything of value that belongs to another."  N.M. STAT. ANN. § 30-16-1 (2006).  Larceny

requires a "mental state . . . [of] intent to take, coupled with knowledge of the facts making the taking unlawful." *State v. Powell*, 848 P.2d 1115, 1117 (N.M. Ct. App. 1993). The elements of larceny are not present unless the property at issue was in possession of the person from whom it is charged to have been stolen. *State v. Curry*, 252 P. 994 (N.M. 1927). As the crime of larceny requires that the subject property belong to another person, "abandoned property does not belong to anyone and may legally be appropriated by the first taker." *State v. Muqqddin*, 242 P.3d 412, 416 (N.M. Ct. App. 2010) (citation omitted) (*rev'd on other grounds sub nom. State v. Office of Public Defender ex rel. Muqqddin*, 285 P.3d 622 (N.M. 2012)). "Abandoned property is defined as property to which the owner has relinquished all right, title, claim and possession." *Speartex Grain Co. v. West*, 645 P.2d 447, 448 (N.M. Ct. App. 1982) (citing BLACK'S LAW DICTIONARY (5th ed. 1979)); *see also State v. Everidge*, 424 P.2d 787 (N.M. 1967) (treating a package dropped from a hotel window as abandoned property, on grounds that it was left in a public place).

Turning to the inquiry of whether Defendants had probable cause to arrest Plaintiff under suspicion of larceny, the Court is aware of the principle that "[p]robable cause only requires a probability of criminal activity, not a prima facie showing of such activity." *Wilder v. Turner,* 490 F.3d 810, 813 (10th Cir. 2007). Nonetheless, the inquiry as to probable cause "requires an examination of the elements of the offense for which [Plaintiff] was arrested[.]" *Jefferson*, 17 F. App'x. at 891. As the parties agree that Plaintiff took the backpack and carried it to his truck, the element in question here is intent: under the circumstances, would Plaintiff's actions warrant a reasonable officer in believing that Plaintiff intended to deprive the backpack's owner of their property?

Officer Melendrez explained his basis for arresting Plaintiff as follows: "He was being detained under suspicion for taking something that didn't belong to him, which is larceny." Doc. 18-5 at 3. He initially stated that the fact that Plaintiff was "looking around" after observing the contents of the backpack supported the probable cause determination, but he later withdrew this statement. *See* Doc. 21-1 at 7. He then vacillated on this question, but ultimately agreed with counsel that looking around is equally likely to indicate criminal behavior as innocent behavior. Additionally, Officer Melendrez stated that the probable cause determination also rested on the fact that Plaintiff first saw the beer and cigarettes in one compartment of the backpack, and then saw the compartment containing the laptop, at which time "he immediately zipped up the bag" and took it to his truck. Doc. 21-1 at 8. In other words, Plaintiff took the backpack to his truck immediately upon discovering that it contained an expensive item. Finally, Officer Melendrez stated that Plaintiff's decision to place the bag in his truck and then return to the ATM indicated an intent to steal. He said that a thief would want to place the backpack in his vehicle immediately so that no one else came to take it, and would then return to the ATM to complete his transactions. In response to this, defense counsel noted that Plaintiff "had an opportunity, once he put the backpack in the truck, to just drive away . . . and he didn't[.]" *Id*. at 9.

In contrast to Officer Melendrez, neither Officer Young nor Officer Knight asserted any facts supporting probable cause to arrest Plaintiff for larceny, aside from the fact that he placed the backpack in his truck. Officer Knight explained that he was a "supporting officer" during the operation and it was not his duty to establish probable cause. Doc. 21-3 at 3. He stated that in light of his present knowledge of the facts surrounding Plaintiff's arrest, "[Plaintiff] could have been stealing. He could have been doing something else. But I would have called the District Attorney to see if it met the elements of the crime." Doc. 21-3 at 3. He then stated that with

respect to this particular tact plan, the squad's conversations with representatives of the District Attorney's office were "the main factor" supporting the arrests.  Doc. 21-3 at 4.

The fact that the officers, subjectively, cannot now come up with a strong basis for probable cause is generally irrelevant.  *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (officer's subjective beliefs about search irrelevant).  An integral component of the doctrine of qualified immunity is the concept that police officers are to be afforded substantial latitude in their judgments, as they often must make "split-second judgments in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Therefore, an arresting officer's opinion that, in hindsight, he had no evidence of a particular element of the crime, will generally be of little import.

Nonetheless, while Defendants were in a sense forced to make a split-second decision as to whether or not to arrest Plaintiff, this occurred in the context of a sting operation the officers had been conducting for weeks.  In inquiring as to the facts and circumstances in the arresting officers' knowledge, the Court cannot disregard the fact that the arrest stemmed from such an operation.  While the Court is aware that the existence of a sting operation in no way negates probable cause, *see United States v. Calp*, 113 F. App'x. 358, 361 (10th Cir. 2004) (finding probable cause existed when arrest stemmed from sting operation), Defendants' knowledge of the operation is relevant to the probable cause calculus.  This is because Sergeant Armijo and the arresting officers had ample time to contemplate whether a taking of the backpack indeed suggested intent to steal.  As Sergeant Armijo testified, he and his squad had instituted several unsuccessful tact plans before commencing the plan involving the backpack.  Presumably, Defendants discussed or at least minimally thought about the prudence of the operation before putting it into action.

11

A reasonable person who invests the slightest amount of time into thinking about the wisdom and effectiveness of this tact plan would conclude that the plan is highly likely to ensnare honest people who are simply attempting to return the backpack to its rightful owner, particularly in light of the fact that it contained beer and cigarettes and appeared to be abandoned, directly across the street from a high school.  Unlike the first variations of the plan – which involved leaving property inside a vehicle or pickup truck bed such that anyone who took it would know it was not abandoned – a reasonable person who found a backpack in a public area with no people in the vicinity could believe it to be abandoned.  In contrast to the initial iterations of the tact plan, the facts of this case are analogous to finding a wallet on the street and taking it home for the purpose of investigating how to contact the owner.[2]

In conducting this probable cause analysis, the Court is aware of the important factor that, according to Officer Melendez, Defendants had minimal time to decide whether or not to make the arrest:

> We usually allow as much time as possible for them to return the bag, flag down a
> police officer, call somebody, call the police, look around for owners.  That way,
> it gives us a better idea of what their intentions are to do with this property.  In
> this instance, there wasn't time to do that.  Mr. Preston [sic] was going to leave
> the scene, and we wouldn't see our property again.

Doc. 21-1 at 4.  In other words, Plaintiff's arrest was unusual because the arrest team was required to take much swifter action than was the normal course for this tact plan.  Yet it appears the officers believed that picking up the backpack automatically amounted to probable cause to arrest for larceny, unless the person was fortunate enough to have no pressing matters in his or her day, and could devote a significant amount of time to locating the owner without leaving the premises of the ATM.  *See* Doc. 21-2 at 8 (Officer Young testifying that Plaintiff's taking of the

---

[2] In fact, Sergeant Armijo testified that he would have probable cause to arrest someone for larceny if they picked up a $100 bill off the ground, as they "could be stealing . . . [by] taking it from somebody else."  Doc. 21-4 at 11.

backpack was the only fact establishing probable cause); Doc. 21-3 at 3 (Officer Knight

testifying the same); Doc. 21-1 at 5 (Officer Melendrez testifying that other subjects had avoided

arrest by "call[ing] 242-COPS . . . [or] put[ting the backpack] in their car and . . . asking people

around the area if that was their bag").

      Judging from Defendants' deposition testimony, it would appear that in order to evade

arrest, one would either need to call 911 to contact the police on the spot (an act of dubious

wisdom, as emergency dispatchers surely have more important matters to attend to); be

resourceful enough to know the police department's non-emergency phone number; or

immediately take time out of their day to attempt to locate the owner.  In contrast to this ideal

person, the Court would surmise that most people – especially those who leave their vehicles

running while they stop at the ATM – have appointments or other obligations to attend to, and

they are attempting to remain on schedule as they conduct their day's affairs.  While such a

person who is concerned primarily for their own affairs would probably be inclined to leave the

backpack undisturbed, one who sees its contents and observes that someone has lost or

misplaced a valuable item such as a laptop certainly might take the backpack so that they can

attempt to locate the owner.  It is commonplace to see flyers or postings on Craigslist advertising

a found item, which the finder hopes to return to its rightful owner so long as that person

provides an accurate description of the item.  A reasonable person in the position of Sergeant

Armijo or the arresting officers should have thought about the near certainty that eventually, a

good Samaritan would take the backpack in the hopes that they could return it to its owner, rather

than allowing a dishonest person to steal it.

      The fact that the arrest team elected to place the backpack – which contained beer and

cigarettes – immediately across the street from a high school, makes it even more likely that an

entirely innocent person would remove it from the premises.  Although Defendants make much of the fact that the arrest occurred during the summer, this does not persuade the Court that a well-intentioned person would leave the backpack under belief that no children were present at the school.  Someone whose schedule is not on the academic calendar would be unlikely to immediately think of this fact, and regardless, many schools operate summer school sessions or other programs on their premises during the summer time.

In devising this tact plan, Defendants should have considered the strong possibility that someone who did not have time to commence an investigation as to the backpack's owner might take it with the intent of locating the owner thereafter.  Had Defendants adequately thought through this plan before instituting it, they would have realized that the plan is designed to catch two types of people: (1) the most dishonest among us – those who see someone else's property on the street and decide to take it for themselves; and (2) those on the opposite end of the spectrum, who are inclined to help a complete stranger and/or to keep alcohol and cigarettes out of the hands of high school students.  In light of this, it cannot be said that upon observing Plaintiff take the backpack, Defendants immediately had probable cause to believe that he intended to steal it.  The simple act of taking a backpack which appears to be abandoned is insufficient to supply probable cause for this element of larceny.  As Defendants have pointed to no circumstantial evidence of Plaintiff's intent to deprive the owner of their property – such as would be present had he removed the backpack from a vehicle – they lacked probable cause to support his arrest.

## 2. Whether the Right Was Clearly Established

The Court agrees with Defendants' assertion that the inquiry as to this prong of the qualified immunity analysis does not end with a simple statement that at the time of the incident

in question, clearly established law required probable cause to support an arrest.  The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality. The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011) (internal citations omitted).  Rather, to find that Defendants have committed a violation of clearly established law, the qualified immunity doctrine demands a "more particularized" inquiry. *Anderson v. Creighton,* 483 U.S. 635, 640 (1987).  While Plaintiff need not reference "a case directly on point," *al–Kidd,* 131 S. Ct. at 2083, he must show that the law was sufficiently settled to allow a reasonable official in the position of the arresting officers to understand that their conduct violated Plaintiff's Fourth Amendment right.  *See Anderson*, 483 U.S. at 640 ("The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.").  In other words, "in the light of pre-existing law the unlawfulness [of the official's action] must be apparent."  *Id.*

"[I]n order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Morris v. Noe,* 672 F.3d 1185, 1196 (10th Cir.2012) (quotation omitted).  The catch with a case such as this one is that it is often difficult, and sometimes impossible, to find a case whose facts even remotely resemble those in any given § 1983 case.  Neither party has cited, nor can the Court find, clearly established law addressing the question of a sting operation comparable to the one at issue in the instant case.  Nor has either party convincingly analogized these facts to any case that could even be said to arguably place the officers on notice that their actions were unconstitutional.

The Court has discovered, however, a relevant Supreme Court opinion addressing the requisite intent to support a larceny conviction.  In *Morissette v. United States*, 342 U.S. 246, 247 (1952), the defendant entered a tract of federal government land that was extensively hunted, which the government used as a bombing range for Air Force target shooting. Making no attempt to conceal his actions, the defendant loaded spent bomb casings – which were dumped in heaps without any organization – into his truck, and eventually sold them to a market.  *Id*.  He was charged with theft of federal property, and he proceeded to trial.  *Id*. at 248.  The trial court instructed the jury to presume that the defendant took the property with felonious intent, as he admitted that it was not his and he took it intentionally.  *Id*. at 249.  The Supreme Court set forth a detailed analysis of the history and evolution of the requirement of intent to deprive that is central to larceny statutes in every United States jurisdiction.  *See id*. at 251-62.  The Court held:

> [T]he trial court may not withdraw or prejudge the issue [of intent] by instruction that the law raises a presumption of intent from an act . . . .  [T]he conclusion supplied by presumption in this instance was one of intent to steal the casings, and it was based on the mere fact that defendant took them.  The court thought the only question was, "Did he intend to take the property?"  That the removal of them was a conscious and intentional act was admitted.  But that isolated fact is not an adequate basis on which the jury should find the criminal intent to steal or knowingly convert, that is, wrongfully to deprive another of possession of property.

*Id*. at 275-76.

In *Morissette*, the "isolated fact" that the defendant intended to take the property was insufficient to prove that he had the requisite criminal intent to deprive the owner of it. Accordingly, such evidence would have been insufficient to support a conviction for larceny. However, the evidence necessary to support a police officer's determination of probable cause is substantially less than that required to support a conviction.  *See Buck v. City of Albuquerque*, 549 F.3d 1269, 1281 (10th Cir. 2008) ("Probable cause only requires a probability of criminal

16

activity, not a prima facie showing of such activity") (citation omitted).  This lesser standard is crucial to the effective functioning of law enforcement.  If a police officer observes someone take property the officer knows does not belong to the subject, the officer's ability to effectively enforce the law will be substantially impeded if he is required to follow the subject until he observes evidence that would prove the subject possessed the intent to steal.  It is for this reason that probable cause requires only a probability of criminal activity, whereas a conviction requires proof beyond a reasonable doubt.  It is in this crucial distinction with respect to the burden of proof that *Morissette* cannot be said to be "clearly established law" controlling the question of whether Defendants had probable cause in the instant case.

The Court must emphasize the difference between a hypothetical scenario marked by a police officer's need to make a split-second decision, and the circumstances at issue in the instant case.  In many scenarios, an officer who observes a suspected larceny will have little, if any, evidence of intent to steal, and he will not know until he questions the subject whether or not an arrest will lead to such evidence.  For example, if an officer happened upon a backpack on the street and observed someone examine its contents and then take it, the officer has little direct evidence of intent to steal, but he might obtain such evidence after confronting the subject.  And in many circumstances, a subject's decision to take property that the arresting officer knows does not belong to him could be sufficient to support a finding of probable cause.  For example, probable cause would exist if the subject looked around nervously, engaged in furtive movements, and somehow attempted to conceal the property as he took it.  However, the facts of the instant case are substantially removed from either of these two scenarios.  Crucially, Defendants did not happen upon a backpack containing beer and a laptop.  Rather, their knowledge of the tact plan, which was instituted in a manner that would almost certainly ensnare

17

innocent people, is a crucial component of the "facts and circumstances within the arresting

officer's knowledge." *See Koch*, 660 F.3d at 1239. As the Court explained above, this

knowledge renders the facts of the instant case insufficient to support a finding of probable

cause. However, neither the Court nor the parties identified any authority that should have put

Defendants on notice of this conclusion.

### C.   Conclusion

To put it bluntly, this sting operation was poorly planned, unwise, and ineffective. In

response to a valid concern about larcenies in downtown Albuquerque, Defendants first devised

a sting operation that involved placing property in private vehicles to see if anyone attempted to

steal it. Although these variations of the plan did not yield any arrests, Defendants certainly

would have had probable cause to believe a subject who reached into a vehicle to remove its

contents did so with the intent to steal the property. Yet Defendants' apparent impatience due to

their failure to effect any arrests led them down a misguided path. They placed a backpack that a

reasonable person would believe to be abandoned next to an ATM, across the street from a high

school. In the backpack they placed items that many concerned individuals would not want to

land in the hands of high school students. The Court is in no way surprised that Preston Sanchez

picked up the backpack out of concern that (1) the beer and cigarettes would get into the hands of

children, and (2) some well-meaning person misplaced their laptop. The Court does not doubt

that Plaintiff had every intent to take steps towards returning the backpack to its owner. The fact

that he did not dial 242-COPS – a phone number unknown to this Court prior to reading the

pleadings in this case – or otherwise drop what he was doing to find the backpack's owner that

instant, in no way suggests that he intended to steal it.

It is troubling to think that our law enforcement agencies devote resources towards sting operations that so obviously target innocent people.  The Court hopes that the backpack tact plan was an aberration, and that APD and the assistant district attorneys who condoned the plan will be more thoughtful when devising such operations in the future.  Nonetheless, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt*, 132 S.Ct. at 1244 (quotation omitted).  The Court does not believe that Defendants' actions in the instant case rise to such a level.  Accordingly, they are entitled to summary judgment with respect to Plaintiff's Fourth Amendment claim.

## II.     Municipal Liability Claim

Having found that the individual defendants are not liable under § 1983, neither the municipality nor Chief Ray Schultz as a supervisor may be held liable.  However, the Court will set forth its analysis of municipal and supervisory liability in the event that it erred in granting qualified immunity.

Supreme Court precedent leaves no doubt that § 1983 does not provide an action for respondeat superior liability.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Therefore, the City of Albuquerque cannot be held liable solely on the basis of its employer-employee relationship with any of the individual defendants.  *See Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 689 (1978).  "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury that the government as an entity

is responsible under § 1983." *Id*. at 694.   The Supreme Court has explained:

> Locating a "policy" ensures that a municipality is held liable only for those
> deprivations resulting from the decisions of its duly constituted legislative body or
> of those officials whose acts may fairly be said to be those of the municipality.
> Similarly, an act performed pursuant to a "custom" that has not been formally
> approved by an appropriate decisionmaker may fairly subject a municipality to
> liability on the theory that the relevant practice is so widespread as to have the
> force of law.

*Bd. of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403-04 (1997) (citing

*Monell*, 436 U.S. at 694).  In addition, the plaintiff must demonstrate "a direct causal link

between the policy or custom and the injury alleged."  *Bryson v. City of Oklahoma City*, 627

F.3d 784, 788 (10th Cir. 2010) (quotation omitted).

A municipality's conduct meets *Monell's* policy-or-custom requirement only if, "through

its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."

*Brown*, 520 U.S. at 404 (emphasis and quotation marks in original).  In *Brown*, the Supreme

Court conveyed the strictness of this standard: "Where a plaintiff claims that the municipality has

not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous

standards of culpability and causation must be applied to ensure that the municipality is not held

liable solely for the actions of its employees."  *Id*. at 405.

 The Tenth Circuit has articulated five possible forms that a municipal policy or custom

may take for §1983 liability to attach:

> (1) a formal regulation or policy statement; (2) an informal custom amounting to a
> widespread practice that, although not authorized by written law or express
> municipal policy, is so permanent and well settled as to constitute a custom or
> usage with the force of law; (3) the decisions of employees with final
> policymaking authority; (4) the ratification by such final policymakers of the
> decisions – and the basis for them – of subordinates to whom authority was
> delegated subject to these policymakers' review and approval; or (5) the failure to

> adequately train or supervise employees, so long as that failure results from
> deliberate indifference to the injuries that may be caused.

*Bryson*, 627 F.3d at 788 (quotations, citations and alterations omitted).

Plaintiff has presented no evidence that the tact plan constituted a formal regulation or policy statement.  Nor has he shown that the plan was an informal custom amounting to a permanent, well-settled, or otherwise widespread practice.[3]  Plaintiff has failed to present any evidence of deliberate indifference on the City or the Department's part, which would be required for a claim of failure to train or supervise.  *City of Canton v. Harris,* 489 U.S. 378, 388. (1989).  Finally, Plaintiff does not directly respond to Defendants' argument that Sergeant Armijo was not a final policymaker, but rather vaguely states that "he ran his policy up the chain of command . . . .  [T]here is enough testimony to demonstrate the plan received ratification by senior enough officials with policy making authority."  Doc. 21 at 19.  In light of Plaintiff's own characterization of Sergeant Armijo's position in the chain of command, the Court has no basis to find that he was a final policymaker.  *See Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010) ("Three factors help us decide whether an individual is legally a final policymaker for a municipality: (1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final – *i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority.") (quotation and alteration omitted).  As Plaintiff appears to concede that Sergeant Armijo was not a final policymaker, the Court will focus its analysis on fourth category of municipal liability articulated in *Bryson*: ratification.

---

[3] Plaintiff argues that the fact that the policy was not a city-wide initiative "is meaningless to the citizens of the downtown area," who were the people affected by the policy.  Doc. 21 at 19.  Perhaps so, but by the same rationale, so are all limitations the law imposes as to municipal liability.  While any downtown citizen arrested pursuant to this tact plan  might prefer for municipal liability to automatically attach, this does not alter the contours of the law.

Municipal liability may be based on the ratification by "final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010).  Accordingly, the question here is whether or not a final policymaker within APD delegated authority to Sergeant Armijo and then ratified his decision to enact the tact plan.  A final policymaker is someone "whose acts or edicts may fairly be said to represent official policy." *Monell*, 436 U.S. at 694.

Sergeant Armijo testified that he was the person who instituted the tact plan, and he agreed with Plaintiff's counsel's characterization that he was "in charge of it."  Doc. 21-4 at 4. He did, however, run the plan up his chain of command, first to his lieutenant, Kevin Rowe, and then to his captain, Ray Mason.  Neither Lieutenant Rowe nor Captain Mason "ha[d] a problem" with the plan.  *Id*.  Sergeant Armijo elaborated:

> I know my commander was aware of the tact plans and how they were operated because they were in my monthlies . . . .  I don't have a lot of access to the higher ups, but I did tell the lieutenant.  The lieutenant was well aware of the tact plan, how it was operating.  He didn't have a problem with it.  As long as I kept on giving him feedback, information, kept him updated with what was going on with the tact plan, it wasn't a problem.

*Id*. at 5.  Finally, Sergeant Armijio discussed the plan with Assistant District Attorney Jill Martinez, who also "didn't have any problem with it."  *Id*.

This testimony from Sergeant Armijo indicates that the lieutenant was not a final policymaker, because he was not among "the higher ups."  This would demonstrate that the lieutenant's decisions are not final, as they are subject to review by officers higher in the chain of command.  Therefore, based on this testimony alone, the Court is unable to find that it was a final policymaker who delegated authority to Sergeant Armijo and subsequently ratified his decisions – *i.e.* "didn't have a problem with it."

Other evidence in the record muddles the question of the precise structure of the chain of command within APD.  The Department's administrative orders describe the authority and responsibilities of the chief of police, and immediately afterward, those responsibilities of a "Superior Officer."  Doc. 18-6 at 20-21.   The orders classify the ranks of sergeant and lieutenant as "Superior Officers."  *Id*. at 21.  The department's policy "is to delegate authority and responsibility to a Superior Officer in order to maintain proper order, conduct, and discipline of their subordinates."  *Id*.  Superior officers must "ensur[e] that their subordinates comply with Department policies and procedures [and must] enforce[] all rules, regulations, and orders of the Department."  *Id*.  In addition, a superior officer is a "supervisor" if he or she "supervises and directs the activities of personnel assigned to them."  *Id*. at 22.  Supervisors are mandated to "[p]romptly obey and support all directives and policies established by the Chief of Police" and "enforce approved policies and plans within their subdivision."  *Id*.

While it would be possible to read these orders as delegating authority to superior officers for ratification by final policymakers, the Court concludes that such a reading would be stretching the case law's definition beyond its intended reach.  In *City of St. Louis v. Praprotnik,* 485 U.S. 112 (1988), a plurality of Supreme Court justices emphasized the proposition that "the authority to make municipal policy is necessarily the authority to make *final* policy."  485 U.S. at 127 (emphasis in original; citation omitted). An official with the power to make discretionary decisions is still not a final policymaker if their "discretionary decisions are constrained by policies not of that official's making."  *Id*.   Other circuits have found that positions similar to Sergeant Armijo's and Lieutenant Rowe's do not fit the definition of "final policymaker" for purposes of municipal liability.  *See*, *e.g.*, *Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003) (police sergeant not a final policymaker); *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518

(4th Cir. 2000) (school principal and superintendent not final policymakers because they answered to school board); *Beattie v. Madison Cty. Sch. Dist.*, 254 F.3d 595 (5th Cir. 2001) (same); *Feliciano v. City of Cleveland*, 988 F.2d 649 (6th Cir.), *cert. denied*, 510 U.S. 826 (1993) (chief of police not final policymaker because subordinate to director of public safety).   On the evidence before it, the Court can confidently conclude that Sergeant Armjio's decision to implement the tact plan – and the basis for it – was not ratified by a final policymaker, nor was authority to make policy delegated to him.   The fact that the "higher ups" might have been aware of the tact plan and done nothing to stop it, does not amount to a delegation of policymaking authority.   *See Praprotnik v. City of St. Louis*, 879 F.2d 1573, 1574 (8th Cir. 1989) (on remand from Supreme Court decision in *Praprotnik*, 485 U.S. 112, concluding: "the fact that such officials simply went along with a subordinate's discretionary decisions, without having investigated the basis for those decisions, does not constitute a delegation of the official's policymaking authority to the subordinate.").

Plaintiff has failed to show that the actions of any of the defendants meet the case law's requirements for the imposition of municipal liability under § 1983.   Accordingly, Defendants are entitled to summary judgment as to this claim.

## III.   Expungement of Arrest Record

Plaintiff moves the Court to expunge the record of his arrest on grounds that he continues to suffer from the effects of the tact plan.   Specifically, as he was a law student at the time he filed his complaint, his arrest for a felony crime involving dishonesty would negatively impact his future career as an attorney.   Defendants argue that this claim should be dismissed, as Plaintiff has failed to state a claim upon which relief can be granted.

In *Toth v. Albuquerque Police Department*, 944 P.2d 285, 286 (N.M. Ct. App. 1997), the New Mexico Court of Appeals observed that no New Mexico statute grants state courts the authority to expunge adult criminal records.  There, the plaintiff was cited for misdemeanor shoplifting and the charge was ultimately dismissed, pursuant to an agreement that she attend petty larceny school.  *Id.*  In her request for expungement, the plaintiff argued that the court should exercise its inherent equitable power granted by the New Mexico Constitution, in light of the potential negative effect her arrest record might have on future employment prospects.  *Id.*  The Court of Appeals noted that the majority of state courts to examine the question have held that "in the absence of statutory authority, courts do not have the power to expunge or restrict access to arrest records."  *Id.* at 287 (citation omitted).  The court declined to recognize a trial court's equitable power to expunge records pursuant to the New Mexico Constitution, but held that regardless of whether such authority existed, the plaintiff had failed to establish compelling circumstances to justify expungement of her records.  *Id.*

The Tenth Circuit has construed the equitable power of federal courts slightly more liberally, holding that "in extreme circumstances, an arrest record may be expunged after dismissal of the charges or acquittal."  *United States v. Pinto*, 1 F.3d 1069, 1070 (10th Cir. 1993) (citing *United States v. Friesen*, 853 F.2d 816, 817 (10th Cir.1988)).  Plaintiff states in a conclusory fashion that "the backpack sting operation is just the type of 'exceptional circumstance' in which someone's arrest record should be expunged."  Doc. 21 at 21.  However, the Court's review of the relevant case law demonstrates that Plaintiff's circumstances do not rise to such a level.  *See*, *e.g.*, *Sullivan v. Murphy*, 478 F.2d 938 (D.C. Cir. 1973) (holding that in the "unique circumstances of mass arrests," expungement warranted in class action filed on behalf of antiwar protestors, where authorities lacked probable cause for arrests, had insufficient

evidence for prima facie case for prosecution, and had departed from established arrest and presentment procedures); *United States v. McLeod*, 385 F.2d 734, 749-50 (5th Cir. 1967) (directing district court to order expungement of arrest records of African-American voting rights activists unlawfully arrested in racially motivated voter suppression effort).  Rather, Plaintiff's argument appears similar to that of the plaintiff in *Pinto*, who simply contended that she "ha[d] been punished enough, and that the presence of the conviction [wa]s unjustly interfering with her efforts to rebuild her life."  1 F.3d at 1070.

Plaintiff does little to distinguish his case from those where courts declined to expunge records.  He merely states that in his case, "there has been no criminal prosecution based on probable cause."  Doc. 21 at 21.  In other words, unlike the defendant in *Pinto* and those in other cases, Plaintiff here has not sustained a conviction.  While this distinction is an important one, it does not automatically bring Plaintiff's case into the realm of the exceptional.  By Plaintiff's logic, any case involving an offensive sting operation after which charges were dismissed would merit expungement in the state or federal courts.  Plaintiff has failed to cite authority to support such a proposition.  Accordingly, this claim shall be dismissed.

**IV.    Claims as to Chief Ray Schultz**

Supervisors are not liable under § 1983 "unless an affirmative link exists between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise."  *Meade v. Grubbs*, 841 F.2d 1512, 1527 (10th Cir. 1988) (quotation and alterations omitted). Additionally, supervisory liability requires a showing that the supervisor made a "deliberate or conscious choice" to employ his or her own unconstitutional policies.  *Barney v. Pulsipher*, 143 F.3d 1299, 1307-08 (10th Cir. 1998) (citations omitted) (internal quotation marks omitted).

In *Iqbal*, the Supreme Court held that "a plaintiff must plead that each Government-official defendant, *through the official's own individual actions*, has violated the Constitution." 129 S.Ct. at 1948 (emphasis added).  The Tenth Circuit has interpreted *Iqbal* as imposing substantial limitations on supervisory liability:

> A plaintiff may . . . succeed in a § 1983 suit against a defendant-supervisor by demonstrating: (1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.

*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quotations, citations and alterations omitted). The court went on to observe that although *Iqbal* may have abrogated certain aspects of Tenth Circuit case law regarding supervisory liability under § 1983, it did not "alter[] the Supreme Court's previously enunciated § 1983 causation and personal involvement analysis." *Id*. at 1200.  The Tenth Circuit discussed the case of *Rizzo v. Goode*, 423 U.S. 362 (1976), where the Supreme Court held that a police commissioner and other city officials could not be held liable under § 1983 for individual police officers' constitutional violations because "there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners – express or otherwise – showing their authorization or approval of such misconduct."  *Dodds*, 614 F.3d at 1200 (quoting *Rizzo*, 423 U.S. at 371).  The court concluded: "This reasoning implies defendant-supervisors may be liable under § 1983 where an 'affirmative' link exists between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . – express or otherwise – showing their authorization or approval of such misconduct.'" *Id*. (quoting *Rizzo,* 423 U.S. at 371).

Following *Iqbal*, the Tenth Circuit identified a number of theories upon which a supervisor may still be held liable under § 1983; however, the precise contours of these theories

of liability remain uncertain.  First, a supervisor may deliberately cause a constitutional violation by "directly order[ing] a subordinate to violate the plaintiff's rights."  *Dodds*, 614 F.3d at 1212.  For example, the supervisor may directly create a policy or custom which sanctions conduct that amounts to a constitutional violation, or may allow such a policy or custom to continue.  *Id*. (citing *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003)).  Next, a supervisor may be held liable under § 1983 if he or she "has actual knowledge of past constitutional violations being carried out by a subordinate, and does nothing to stop future occurrences."  *Id*. at 1212.  Finally, "supervisory shortcomings," which include a failure to train or supervise, could lead to liability. *Id*.  This requires a standard of deliberate indifference.  *Id*. at 1212-13.  After discussing the uncertainty in the law, the Tenth Circuit concluded that, quite simply, "supervisors are liable for constitutional violations they cause."  *Dodds*, 614 F.3d at 1213.

The Court sets forth this summary of *Iqbal* only to highlight the uncertainty of the current state of the law.  Notwithstanding the potential for flexibility in light of this uncertainty, the Court finds that even the most liberal reading of post-*Iqbal* authority would not impose liability upon Chief Schultz for the actions of lower ranking officers in effecting the tact plan.  Plaintiff has produced no evidence with respect to Chief Schultz's involvement in or knowledge of the tact plan, nor did he respond to Defendants' argument that his claim against Chief Schultz fails. Given this sheer lack of evidence, Chief Schultz cannot be said to have caused any constitutional violation.  Accordingly, all claims against Chief Schultz are hereby dismissed.

## V.      State Law Claims

As set forth above, the Court has decided to dismiss or grant summary judgment to Defendants as to all of Plaintiff's federal claims.  Having thus disposed of all of the federal

claims in this action, this Court is authorized to dismiss Plaintiff's supplemental state claim as well.  *See Bateman v. City of West Bountiful*, 89 F.3d 704, 709 (10th Cir. 1996).

Specifically, the Court has discretion to decline to exercise jurisdiction where, as here, it has dismissed "all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).  "The Supreme Court has instructed that 'a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.'"  *Merrifield v. Bd of County Comm'rs for Santa Fe*, 654 F.3d 1073, 1085 (10th Cir. 2011) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)).  Further, the Tenth Circuit has "generally held that if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."  *Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010).

Taking into consideration the relevant factors, and following Tenth Circuit precedent, the Court declines to exercise supplemental jurisdiction over Plaintiff's claim under the New Mexico Tort Claims Act.  The interests of judicial economy, convenience, fairness and comity all weigh in favor of allowing the state court the opportunity to resolve this claim.  Accordingly, the Court will dismiss, without prejudice, the state law claim in its entirety.

## CONCLUSION

It is **HEREBY ORDERED** that *Defendants' Motion for Summary Judgment and Memorandum in Support, Requesting Dismissal of Plaintiff's Entire Complaint* (Doc. 18) is **GRANTED** with respect to the following claims: (1) Fourth Amendment violation; (2) municipal liability; (3) equitable relief; and (4) supervisory liability.  Plaintiff's claim under the

New Mexico Tort Claims Act is **DISMISSED WITHOUT PREJUDICE**.  Defendants' Motion

is **DENIED AS MOOT** with respect to this claim.


Dated this 28th day of March, 2013.


_____

**MARTHA VÁZQUEZ**
**UNITED STATES DISTRICT JUDGE**


*Attorney for Plaintiff:*
Matthew Coyte

*Attorneys for Defendant:*
Kathryn Levy
Paul M. Cash